# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEDDY LEROY WILSON,<br><br>                              Plaintiff,<br><br>v.<br><br>UNKNOWN OCEANSIDE POLICE OFFICERS, et al.,<br><br>                              Defendants. | Case No.:  23-cv-270-TWR-DDL<br><br>**REPORT AND RECOMMENDATION FOR ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[Dkt. No. 60]** |

Plaintiff Teddy LeRoy Wilson, proceeding *pro se* in this civil rights action, alleges various law enforcement personnel violated his constitutional rights during his arrest on January 3, 2023.  Before the Court is a Motion for Summary Judgment or Alternatively, Summary Adjudication of Issues (the "Motion" or "Mot.") by defendants City of Oceanside, Sergeant Jeff Brandt, Officers Daniel Post, Aaron Weirich, Billy Walker, Natalie Laser, and Dustin Lundy, and Field Evidence Technician Michelle Alarcon (collectively, "Defendants").  Dkt. No. 60. Pursuant to 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.3.e, the undersigned Magistrate Judge submits this Report and Recommendation to United States District Judge Todd W. Robinson. For the reasons stated below, the undersigned **RECOMMENDS** the District Judge **GRANT** Defendants' Motion.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.

## <u>BACKGROUND</u>

This case arises out of Plaintiff's arrest at Oceanside Transit Center on January 3, 2023.  Plaintiff filed his complaint against "unknown Oceanside police officers," "unknown Tri City Hospital Staff," "unknown Oceanside Fire and Paramedics," and "unknown Oceanside police supervisors and trainers" on February 7, 2023.  Dkt. No. 1.  Plaintiff stated as the sole "Count 1" against all Defendants:

> The following civil rights has [*sic*] been violated: Treated with deliberate indifference, gross negligence, pregedice [*sic*], hate based torture towards a 290, intentional infliction of pain, cruel and unusual punishment, police brutality, over excessive force, denied equal protection under the law, asalt [*sic*] and battery against an ADA mentally disabled parolee and 290, inflicted great bodily injury against an ADA mentally disabled parolee, denied fair and proper treatment, denied proper medical treatment because a 290, violated basic human right [sic], discrimination, etc.

*Id.* at 4.  Plaintiff was unaware at the time he filed his complaint of the identities of the officers and others involved in his arrest and transfer to Tri-City Medical Center.  *See id.* at 10.  After conducting the screening required by 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), the Court determined Plaintiff's complaint stated a plausible cause of action for the use of excessive force in violation of the Fourth Amendment.  Dkt. No. 5 at 6.

Subsequently, Plaintiff identified Defendants and T. Nelson of "County Probation" as the "unknown" officers named in his original complaint.  Dkt. No. 6.  Upon receipt of Plaintiff's "Motion and Request to Amend Complaint," wherein he provided the names of the law enforcement officers who allegedly violated his rights, the Court issued an order substituting these individuals as defendants and / / /

1    directing service by the United States Marshal Service.  Dkt. No. 7.  Defendants
2    answered the complaint on July 31, 2023.  Dkt. No. 19.

3                                    **II.**

4                          **LEGAL STANDARDS**

5          Summary judgment is appropriate "if the movant shows that there is no
6    genuine dispute as to any material fact and the movant is entitled to judgment as
7    a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the
8    outcome of the suit under the governing law," and a dispute is genuine "if the
9    evidence is such that a reasonable jury could return a verdict for the nonmoving
10   party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[1] "Disputes over
11   irrelevant or unnecessary facts will not preclude a grant of summary judgment."
12   *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

13         "The party moving for summary judgment bears the initial burden of
14   establishing the absence of a genuine issue of material fact and can satisfy this
15   burden by presenting evidence that negates an essential element of the non-
16   moving party's case." *Nat'l Grange of the Ord. of Patrons of Husbandry v. California
17   State Grange*, 115 F. Supp. 3d 1171, 1176 (E.D. Cal. 2015).  "Alternatively, the
18   moving party can demonstrate that the nonmoving party cannot produce evidence
19   to support an essential element upon which it will bear the burden of proof at
20   trial." *Id.* "Once the moving party carries its initial burden, the adverse party may
21   not rest upon the mere allegations or denials of the adverse party's pleading, but
22   must provide affidavits or other sources of evidence that set forth specific facts
23   showing that there is a genuine issue for trial." *Devereaux v. Abbey*, 263 F.3d 1070,

---

24
25
26   [1]    All citations, subsequent history, and parallel reporter citations are omitted
27   unless otherwise noted.  In direct quotes, all internal quotation marks, brackets,
     ellipses and footnotes are omitted, and all emphasis is added,  unless otherwise
28   noted.

1076 (9th Cir. 2001) (en banc).  The party opposing summary judgment "must come forth with evidence from which a jury could reasonably render a verdict [for] [him], assuming that all justifiable inferences are drawn in [his] favor." *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 898 (9th Cir. 2021). If the "record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

On a motion for summary judgment, "the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec.*, 475 U.S. at 587.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . .." *Anderson*, 477 U.S. at 255.  "[T]he district court may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).

### III.

### DISCUSSION

**A. Summary of Facts**

"[T]he first step in assessing the constitutionality of [the officers'] actions is to determine the relevant facts." *Scott*, 550 U.S. at 378.  All parties agree the events of January 3, 2023 are accurately depicted in the footage from the officers' body-worn cameras ("BWC" or "bodycam").  *See* Ex. 12 to Defendants' Notice of Lodgment ("NOL") (cited hereafter as "Pltf. Dep."), Dkt. No. 60-3, at 65:22-25.[2] The relevant facts are therefore largely undisputed and are summarized here. *See*

---

[2]    All citations are to the CM/ECF page numbers.

1  *Gabriel v. Cnty. of Sonoma*, 725 F. Supp. 3d 1062, 1071 (N.D. Cal. 2024) ("When, as

2  here, a video of the incident exists and no one questions its accuracy, the Court

3  views the facts in the light depicted by the videotape."); *see also* Fed. R. Civ. P. 56(e)

4  (permitting the Court to "treat as undisputed" any fact not countered by contrary

5  evidence).[3]

6  ### 1. *Officers Post and Weirich Arrive at Oceanside Transit Center*

7  At 9:12 p.m. on January 3, 2023, Oceanside Police Department ("OPD")

8  Officers Post and Weirich responded to reports of a disturbance in the women's

---

11  [3]    Defendants submitted the video and transcribed audio of the BWC footage

12  in support of their Motion.  The Court, having reviewed all of the footage and the

13  accompanying transcripts, finds that with the exception of certain nuances based

14  on the officers' position in the room, the material events of January 3, 2023 from

15  Post's and Weirich's initial arrival at the transit center to Plaintiff's arrival at Vista

16  Detention Facility are captured on Post's and Lundy's BWC footage (cited

17  hereafter as "Post BWC" and "Post BWC-8" (Exs. 1 and 8 to NOL)  and "Lundy

18  BWC," "Lundy BWC-3.2," "Lundy BWC-3.3," "Lundy BWC-3.4," "Lundy BWC-

19  3.5," "Lundy BWC-3.6," and "Lundy BWC-3.7") (Exs. 3, 3.2, 3.3., 3.4, 3.5, 3.6, and

20  3.7 to the NOL, respectively).  Therefore, to avoid duplication, the Court cites only

21  to this footage unless necessary for additional context.  The Court uses the

22  timestamp on the BWC for pinpoint citations, which can also be corroborated

23  against the other BWC footage in the record.  Where necessary, the Court may cite

24  additional BWC footage as "[Officer Name] BWC" (Exs. 2, 4, 5, 6 and 7 to the NOL)

25  or the transcripts of the footage (Exs. 1A, 2A, 3A, 3.1A, 3.2A, 3.3A, 3.4A, 3.5A, 3.6A,

26  3.7A, 4A, 5A, 6A, 7A, and 8A to the NOL).  The Court has also reviewed frame-by-

27  frame printouts of the BWC footage (Exs. 9 and 10 to NOL), contemporaneously

28  prepared arrest reports (Exs. 15 through 24 to NOL), declarations from Defendants

and their experts and consultants (cited hereafter as "[Declarant Name] Decl.")

(Dkt. Nos. 60-5 through 60-17), OPD's "Consolidated Use of Force Policy Manual"

(Ex. 11 to NOL), and excerpts of Plaintiff's deposition.  For pinpoint citations to

documents, the Court cites to declarations by numbered paragraph and to all other

documents by the CM/ECF page numbers.  Plaintiff did not submit any evidence.

restroom at Oceanside Transit Center.  Post BWC-8 at 21:12:40.  Upon their arrival, a bystander informed them that a man was in the women's restroom and had exposed himself to her and others.   Post BWC-8 at 21:12:45-21:12:55; 21:13:30-21:13:40.  The officers entered the restroom at 9:14 p.m. and identified themselves as Oceanside Police.  Post BWC at 21:14:21.  They found Plaintiff locked in the last stall.  *Id.*

Post and Weirich requested Plaintiff exit the stall.  Post BWC at 21:14:27-40.  Plaintiff refused, stating he "fear[ed] for his life."  *Id.* at 21:14:45.  Plaintiff later testified he was in the stall "trying to calm down."  Pltf. Dep. at 276:9-11.  In furtherance of this effort, he smoked marijuana and consumed approximately half a pint of Southern Comfort while in the stall.  *Id.* at 276:1-17.

Post attempted to unlock the stall with a knife but was unsuccessful.  Post BWC at 21:17:37-46.  Post then entered the stall next to Plaintiff and, climbing up on the toilet, was able to observe Plaintiff, who was fully clothed and had a backpack with him.  *Id.* at 21:16:40; Post Decl., ¶ 8.  Post attempted to open the stall door using his expandable baton, but Plaintiff stopped him.  Post BWC at 21:18:28-45; Post Decl., ¶ 8.  During this time, Post and Weirich continued to instruct Plaintiff to exit the stall, told Plaintiff they were there to help him, and that they were "not [t]here to harm [him]" but "just want[ed] [him] to leave the bathroom." Post BWC at 21:15:11, 21:17:52-57.  They also invited Plaintiff to "come on out and tell us your side."  *Id.* at 21:15:38.  Plaintiff continued to refuse to leave the stall, telling the officers he would be out "in 10 minutes."  *Id.* at 21:16:15, 21:17:27.  Post and Weirich advised Plaintiff that his failure to cooperate would make "the problem" worse.  *Id.* at 21:18:06-08.

After trying for approximately five minutes to coax Plaintiff out of the stall, Weirich made a "step" for Post with his cupped hands, enabling Post to push himself into a position to unlock the stall door.  Post BWC at 21:19:45-50.  Up to that point, Post and Weirich had instructed Plaintiff to come out of the stall at least

19 times.  *See* Ex. 1A at 2:9, 14-15, 19-20; 3:1, 3, 7, 9, 12, 20, 22-24; 4:1, 11, 16, 19; 5:23; 6:13, 15-16; 19; 7:4.

At 9:19 p.m., Post and Weirich succeeded in opening the stall door and commanded Plaintiff to exit the stall with his hands behind his back.  Post BWC at 21:19:50.  Post and Weirich moved into the stall to control Plaintiff.  *Id.*  Plaintiff stood facing Post and Weirich with his hands up, but then turned away from them, towards his backpack.  *Id.* at 21:19:50-52.  When the door opened and Plaintiff turned toward his backpack, Post ordered: "You need to get out.  Put your hands behind your back."  *Id.* at 21:19:52.  Wilson continued reaching for his backpack, and Post took hold of Plaintiff's left arm and turned Plaintiff to face the officers.  *Id.*  Plaintiff formed a fist with his right hand and swung at Post, who deflected the blow.  *Id.* at 21:19:52-53; *see also* Ex. 1A at 27 (Weirich's statement at the scene that "[Post] popped the door, we went in and [Plaintiff] pretty much swung on [Post] right away"); Pltf. Dep. at 288:1-8 ("Q: [Y]ou do remember seeing the body-worn camera where you had your arm raised up and it was made in a punch; correct? A: Yes. That was . . . after I had turned around.  Because I was not facing the officer . . . I was facing the wall.  He came up, touched me.  I turned around, and that's when I balled up my fist like that.").  Plaintiff dropped his arm, but then raised his clenched fist again.  Post BWC at 21:19:54-55.  Post, interpreting Plaintiff's stance as aggressive, deflected Plaintiff's punch with his left hand and struck Plaintiff with a closed-fist "distraction blow" that landed on the right side of Plaintiff's face.  *Id.* at 21:19:54-55; *see also* Post Decl., ¶ 12.

Post and Weirich struggled with a "combative" and uncooperative Plaintiff, and the floor was slippery.  Post BWC 21:20:00; *see also* Weirich Decl., ¶ 14.  Ultimately Post and Weirich were able to pull Plaintiff's shirt over his head and maneuver him out of the stall, but Plaintiff continued to resist the officers and refused to comply with commands to get on the ground.  Post BWC at 21:20:00-08.  Post warned Plaintiff, "give us your hands now or you're gonna get hit," but

Plaintiff continued to try to stand up. *Id.* at 21:20:10-11. Weirich delivered two knee strikes to Plaintiff's left side and Post delivered one knee strike to Plaintiff's right side. *Id.* at 21:20:14-17; *see also* Post Decl., ¶ 15; Weirich Decl., ¶ 9. Post pressed the emergency button on his radio to request backup, stating, "we're in a fight." *Id.* at 21:20:21-23.

After being struck, Plaintiff got partway on the ground but continued to thrash about and attempted to stand. Post BWC at 21:20:25-35, 21:21:12-15, 21:21:47. To avoid being handcuffed, Plaintiff grabbed the base of one of the stalls and also tucked his arms under his torso. *Id.* at 21:20:25-45; *see also* Pltf Dep. at 275:18-22 ("Q: When you were on the ground and the officers were telling you to put your arms behind your back, you continued to struggle. Isn't that correct? A: Okay. Correct. Q: And isn't it true that when the officers were telling you to put your arms behind your back, you continued to reach for and grab and hold on to the pillar of the bathroom stall? A: Correct."). Weirich pulled Plaintiff's left arm partially free while Post lay across Plaintiff's back to control him. Post BWC at 21:20:45. Weirich and Post kept Plaintiff, still struggling, on the ground in this manner until additional officers arrived. *Id.*; *see also* Post Decl., ¶ 16; Weirich Decl., ¶ 11. Post observed Plaintiff was bleeding from his face. Post Decl., ¶ 16.

### 2. *Additional Law Enforcement Arrive at Oceanside Transit Center*

At approximately 9:22 p.m., OPD Sergeant Brandt and OPD Officers Laser, Lundy and Walker (all Defendants in the action) and OPD Officer Cahill (a nonparty) arrived on the scene in response to Post's emergency call. Post BWC at 21:22:17. In response to Brandt's instruction, Lundy returned immediately to his vehicle to retrieve a restraint device known as a WRAP. Lundy BWC at 21:22:34-21:23:19; Lundy Decl., ¶ 6. Plaintiff continued to struggle against the officers and to refuse their commands to cooperate. Lundy BWC at 21:23:20; Laser Decl., ¶ 9. Laser sat on Plaintiff's legs to control his lower body. Lundy BWC at 21:23:20; Laser Decl., ¶ 8.

At 9:23 p.m., Plaintiff was placed in handcuffs.  Post BWC at 21:22:59.  Laser attempted to search Plaintiff for weapons but Plaintiff resisted by moving his legs and lower body; after he was restrained, Plaintiff was found to have a knife on his person.  Lundy BWC at 21:23:45-21:24:20; *see also* Post Decl., ¶ 17.

At 9:24 p.m., Plaintiff told the officers once, "it hurts."  Post BWC at 21:24:03.  He otherwise demanded to know why he was being arrested and argued with the officers that he had not done anything wrong.  *Id.* at 21:23:10-21:24:48.

At 9:25 p.m., Laser, Lundy and Cahill applied a partial WRAP to restrain and subdue Plaintiff.  Post BWC at 21:25:02-21:26:11.  Walker held Plaintiff's feet immobile while the WRAP was prepared and helped secure Plaintiff's ankles.[4]  Lundy BWC at 21:24:33-21:26:07.

At 9:26 p.m., Brandt told the officers, "Before we get much further, let's readjust the right handcuff, because it's twisted.  Let's get it on there the right way."  Post BWC at 21:26:27-52.  Plaintiff interjected, "How about just keeping them off?"  *Id.* at 21:26:36.  Post put a "spit sock" and foam helmet on Plaintiff's head.  *Id.* at 21:26:10-21:26:56.  Brandt also told the officers not to restrain Plaintiff's upper body (aside from the handcuffs) and to put Plaintiff in "recovery position."  *Id.* at 21:26:36-41.  The officers complied, rolling Plaintiff onto his left side.  *Id.* at 21:26:45.  Throughout this encounter, Plaintiff continued to question why he was being arrested and denied he "swung on" anyone.  *Id.* at 21:26:04-21:29:17.  He also

---

[4]    Walker states in his declaration he did not "specifically assist with the application of the restraints."  Walker Decl., ¶ 8.  On the Court's review it appears Walker tightened the WRAP restraints, but it is not entirely clear given that Walker's BWC could not be located and the officer's name plate is not visible in the BWC footage.  *See id.*, ¶ 10; Lundy BWC at 21:24:33-21:26:07.  Any inconsistency is immaterial to the Court's analysis.

told the officers he had "permission" to be in the women's restroom and "I come in here all the time to be safe." *Id.* at 21:28:40-47.

At 9:28 p.m., Cahill adjusted Plaintiff's handcuffs.  Post BWC at 21:28:10.  Plaintiff agreed the handcuffs felt "better" and complained that before the adjustment it "hurt like a motherf****r" because they were "so tightened." *Id.* at 21:28:10-16.  Cahill explained the handcuffs were "on crooked." *Id.* at 21:28:16.

Once Plaintiff was restrained, Cahill retrieved Plaintiff's wallet and located his driver's license.  Post BWC at 21:27:10-15.  Post and Weirich confirmed they had not "run" Plaintiff, stating, "we have no idea who he is." *Id.* at 21:27:19-21.  Cahill called in Plaintiff's driver's license number and name. *Id.* at 21:27:26-35.  Upon inspection of Plaintiff's backpack, Officer Heinze (who is not a party to this action) discovered a cut-off GPS monitor, which the officers reported to Brandt. *Id.* at 21:31:44-45, 21:36:25-27.  Cahill was informed Plaintiff was "on probation for 290 and 69," which he relayed to Lundy and Laser.[5]  Cahill Decl., ¶ 20; Ex. 5A at 178:10-14.

Several officers observed blood on Plaintiff's face and hands and on the floor at the scene.  *See* Post Decl, ¶ 16; Cahill Decl, ¶ 7; Laser Decl., ¶ 9.  Post stated Plaintiff was "bleeding from his face" and that he had "punched [Plaintiff] in the nose."  Post BWC at 21:29:59-21:30:04.  Brandt summoned paramedics to assess Plaintiff and requested a field evidence technician to collect evidence at the scene.  Brandt Decl. ¶ 6; *see also* Ex. 14.  Plaintiff was restrained when paramedics arrived.  Post BWC at 21:30:32.

---

[5]     The Court understands these refer to Plaintiff's prior convictions for resisting arrest (Cal. Penal Code § 69) and for failing to register as a sex offender (Cal. Penal Code § 290).  The Court further understands Plaintiff's description of himself as "a 290" is a shorthand reference to his status as a registered sex offender.

Plaintiff told the paramedics he was "ADA mentally disordered" but otherwise refused to answer their questions.  Lundy BWC at 21:34:43-21:35:10.  Plaintiff's eyes were closed during most of his interaction with the paramedics. *See* Lundy BWC at 21:30:55-21:31:45 (paramedic's repeated requests to "open your eyes"); Pltf. Dep. at 279:9-25 ("I couldn't see through [the spit sock], yes.  And that was kind of because I had my eyes closed, too."); *id.* at 286:2-6 ("As I said, I kept my eyes closed primarily the whole time that . . . I was in the custody of the sheriffs [*sic*] and the Tri-City.").  Plaintiff denied needing further medical assistance, stating, "I'm okay, I'm fine, I'm fine," "I don't want to go to the hospital, I'm fine," and "I don't want any treatment."  Lundy BWC at 21:32:19; 21:40:16; 21:40:42-44.  When a paramedic removed the blood pressure cuff from his upper arm, Plaintiff asked, "Why do you keep hurting me?" (*see id.* at 21:36:24) but did not otherwise indicate he was in pain (including when the blood pressure cuff was applied).  Instead, throughout questioning by the paramedics, Plaintiff remained uncooperative and accused the officers of "beating [his] ass" because he was "a 290."  *Id.* at 21:39:25.  However, Plaintiff stated he had been "knocked out" and could not remember everything that had happened, leading the paramedics to determine he needed further treatment and observation.  *Id.* at 21:41:14-21:41:26.  Before being moved to the ambulance, Plaintiff was informed he was being charged with assault on a police officer and violating his parole.  *Id.* at 21:41:59-21:42:08.

Alarcon (a Defendant in this action) arrived at Oceanside Transit Center after Plaintiff was removed from the scene and took photographs of the scene and the responding officers, then proceeded to Tri City Medical Center to photograph Plaintiff.  Brandt Decl. ¶ 7; Alarcon Decl., ¶¶ 6, 8, 10.

### 3.  *Plaintiff Is Taken to Tri City Medical Center, Then Booked at VDF*

Plaintiff was transported to Tri City Medical Center; Laser rode in the ambulance with him and Lundy followed in a patrol car.  Laser Decl. ¶ 11; Lundy

Decl. ¶ 8; Brandt Decl. ¶ 7.  In the ambulance bay at Tri City Medical Center, Brandt gave Plaintiff *Miranda* warnings, then asked Plaintiff if he wanted to answer questions.  Lundy BWC-3.2 at 22:35:39-22:36:11.  Plaintiff refused to answer questions but gave a statement of the night's events.  *Id.*  Plaintiff related that he was "in the back stall" when Post and Weirich "jumped over and unlatched it and then they started hitting me."  *Id. at* 22:36:12-23.  Plaintiff stated he heard Post and Weirich identify themselves as "PD," but asserted he did not know that meant they were police.  *Id. at* 22:37:22-22:37:55.

While in the ambulance bay, Lundy removed the WRAP after confirming that Plaintiff would not try to hurt anyone if his restraint was removed.  Lundy BWC-3.4 at 22:52:17-22:53:04.  Lundy also offered to move Plaintiff (who was lying in the gurney on his side, with his face down) to his back or a seated position, but Plaintiff declined, stating he was "in pain" and that "moving me would cause some more pain."  Lundy BWC-3.5 at 22:45:11-22:45:58.  In the examination room, Lundy removed Plaintiff's spit mask to enable a nurse to evaluate the cut on Plaintiff's face, at which time Plaintiff stated he did not want the doctor to look at it and did not want to talk to anyone.  Lundy BWC-3.4 at 23:17:46-23:18:07.  When the nurse turned Plaintiff's face to inspect the cut, Plaintiff said "just twist me around, completely in pain and s**t."  *Id.* at 23:18:20-23:18:31.  The nurse asked Plaintiff where his pain was, but he refused to answer.  *Id.* at 23:18:37-23:18:46.  Lundy and Laser restrained Plaintiff while the same nurse injected Plaintiff with Haldol in preparation for a CAT scan, to which Plaintiff objected.[6]  Lundy BWC-3.6 at 23:29:16-23:29:37.

/ / /

---

[6]    "Haldol" is incorrectly transcribed as "Tylenol" in the transcript.  *See* Ex. 3.6A at 130.

23-cv-270-TWR-DDL

Plaintiff was cleared for booking and transported to Vista Detention Facility shortly before 1:00 a.m. by Laser and Lundy.  Laser Decl., ¶ 12; Lundy Decl., ¶¶ 13-14.

### 4. *Plaintiff Pleads Guilty to Resisting Arrest*

On January 23, 2023, Plaintiff pled guilty to a felony violation of California Penal Code § 69, admitting he "unlawfully resisted an executive officer using threats [or] violence."[7]  Plaintiff testified at his deposition that he understood he was charged with, and pled guilty to, resisting arrest.  Pltf. Dep. at 267:18-268:8.

## B. Excessive Force

### 1. *Legal Standards*

"When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).  "Force is excessive when it is greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002), *abrogated on other grounds by Cnty. of Los Angeles v. Mendez*, 581 U.S. 420 (2017).  To assess whether "officers employed an objectively unreasonable amount of force under the totality of the circumstances . . . requires balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Est. of*

---

[7]    Pursuant to Federal Rule of Evidence 201(b)(1) and (2), the Court grants Defendants' request to take judicial notice of the fact that Plaintiff pled guilty to a violation of California Penal Code § 69 and admitted he "unlawfully resisted an executive officer using threats [or] violence," as set forth in Exhibit 13 to the NOL (Plaintiff's guilty plea dated January 23, 2023 and the felony abstract of judgment dated February 24, 2023 in *People of the State of California v. Teddy LeRoy Wilson*, San Diego Superior Court Case No. CN440152).  *See* Fed. R. Evid. 201(b)(1) and (2); *D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1191 (S.D. Cal. 2024) (noting court filings are judicially noticeable because they are "readily verifiable").

*Strickland v. Nevada Cnty.*, 69 F.4th 614, 619 (9th Cir. 2023) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989) and *Brooks v. Clark Cnty.*, 828 F. 3d 910, 920, 922 (9th Cir. 2016)).  This analysis demands "careful attention to the facts and circumstances of each particular case."  *Graham*, 490 U.S. at 396; *accord Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010). (to evaluate a claim of excessive force, court must "ask whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.").  "Stated another way, [the Court] must balance the amount of force applied against the need for that force."  *Id*. at 823-824.  The "ultimate inquiry" is "whether the totality of the circumstances justifies a particular sort of seizure."  *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011).

A nonexhaustive list of factors the Court may consider in assessing whether an officer's use of force was reasonable includes "(1) the type and amount of force inflicted, (2) the severity of the crime at issue, (3) whether the suspect posed an immediate threat to the safety of the officers or others, and (4) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Est. of Strickland*, 69 F.4th at 619.  Courts "may also consider . . . the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed."  *Id*.  The most important factor is "whether the [individual] posed an immediate threat to the safety of the officers or others." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).

Where the "the totality of the circumstances" demonstrates that officers' use of force was a "reasonable response that was commensurate" to the countervailing government interests at stake, the force was not excessive.  *Puente v. City of Phoenix*, 123 F.4th 1035, 1058-59 (9th Cir. 2024).

/ / /

/ / /

### 2.  Findings and Recommendation

The parties devote the majority of their briefing to the use of force by Post and Weirich during the first six minutes of their encounter with Plaintiff.  The Court agrees with Defendants that "[d]istilled to its essence, the use of force called into question here is Officer Post's punch to Plaintiff's face and the officers' knee strikes."  Memorandum in Support of Defendants' Motion for Summary Judgment or Partial Summary Judgment ("Mem."), Dkt. No. 60-1, at 17.  Nevertheless, the Court has also considered Plaintiff's excessive force claim as it relates to each of the Defendants, and, for the reasons discussed below, concludes all Defendants are entitled to summary judgment.

#### a.  Post and Weirich

##### i.  Fist Strike

Turning first to Post punching Plaintiff in the face, the Court finds on balance the *Estate of Strickland* factors favor Defendants.  The force used was "significant." *See Brown v. Grinder*, No. 213CV01007KJMKJN, 2019 WL 280296, at *8 (E.D. Cal. Jan. 22, 2019) ("Fist strikes, or punches, also qualify as a significant use of force.") (collecting cases).  But the "severity of the crime at issue" – Plaintiff's imminent assault on Post – was also "serious" and "warrant[ed] the use of potentially significant force to ensure [Plaintiff] submitted to arrest."  *Spencer v. Pew*, 117 F.4th 1130, 1138-39 (9th Cir. 2024) (further noting that the suspect's felony-level violence against the officer was the "crime at issue" regardless of the severity of the offense that initially drew the officers' attention).

Consideration of whether Plaintiff was actively resisting arrest and whether he posed an immediate threat to the officers' safety also favors Defendants, *see id.* at 1139; as does Plaintiff's "responsibility for the escalation of th[e] incident."  *See Mattos*, 661 F.3d at 445.  The evidence shows that Post used a single "distraction blow" to counter what he reasonably perceived to be an imminent assault by Plaintiff, who was actively resisting arrest and who had, up to that moment, defied

19 instructions to exit the stall. Before forcing their way into the stall, Post and Weirich attempted for approximately 5 minutes to convince Plaintiff to exit the stall, inviting Plaintiff to come out voluntarily and "tell his side," and warning that if he refused to cooperate things would be "worse" for him. Plaintiff did not comply, and, when Post and Weirich opened the stall door on their own, Plaintiff turned away from them toward the back of the stall and reached for his backpack, the contents of which were not known to the officers. *See Lowry v. City of San Diego*, 858 F.3d 1248, 1258 (9th Cir. 2017) (en banc) (noting officer was "entitled to assume" suspect who had been hiding and was possibly armed "posed an immediate threat").[8] Plaintiff did not comply with Post's command to put his hands behind his back.[9] When Post grabbed Plaintiff's left arm, Plaintiff attempted to strike Post with a closed fist.

Balancing the parties' respective interests, the Court finds Post's use of force was not excessive, as "the force used was not severe, and the officers had a compelling interest in protecting themselves against foreseeable danger in an uncertain situation . . .." *Lowry*, 858 F.3d at 1260 (affirming summary judgment on excessive force claim).

Plaintiff admits he was "standing with his fist raised," but denies he was "actively fighting" the officers, claiming he was in a "fight or flight reaction" because he "believed he was being attacked." Plaintiff's Opposition to Motion for

---

[8]    *See also* Pltf. Dep. at 289:1-5 (Plaintiff acknowledging that "the officers don't know if you've got a weapon, if you're retrieving a weapon" while he was locked in the stall).

[9]    *See id.* at 273:19-274:9 (Plaintiff's testimony that "turning around and trying to grab my backpack instead of just letting them cuff me" was not "the best judgment" because "[he] should have been alerted that the officers were – thought I was reaching for a weapon or to destroy evidence or whatever").

Summary Judgment or Partial Summary Judgment ("Opposition" or "Opp."), Dkt. No. 74, at 7-8; *see also id.* at 8 (Plaintiff acknowledging his "arm and fist stayed raised").  Plaintiff insists he was not "angry" as he (admittedly) stood and faced Post with his fist "ball[ed] up" and argues the bodycam footage shows only that "[his] fist was merely raised" and not in a "forward motion as a punch."  Opp. at 7-8.  Plaintiff's deposition testimony, wherein he admitted he was intent on striking Post, belies this assertion:

> A: . . . I guess I was reaching for my backpack, but I was so disoriented . . . with the fear and stuff that I was feeling at that time.  . . . I was trying to comply, but then when they grabbed me, I didn't know what was going on and, you know, that's when I turned around and . . . I was in fear, you know, and ***I thought I had to fight***.
>
> Q: Is that why ***you doubled up your fist and went to strike a blow at the officer***?
>
> A: ***Yes ma'am***.

Pltf Dep. at 266 (emphasis added).  Moreover, Defendants are correct that Post was not required to "wait until Plaintiff struck [him]" (thus making his intent clear) to act.  Mem. at 17 (citing *Reynolds v. Cnty. of San Diego*, 858 F. Supp. 1064, 1072 (S.D. Cal. 1994), *aff'd in part and remanded in part on other grounds*, 84 F.3d 1162 (9th Cir. 1996)).

Plaintiff asserts his actions were attributable to  his purported "fear for [his] life and safety."  Opp. at 7.  But Defendants were not required "to credit [Plaintiff's] claims about why he was not cooperating."  *Spencer*, 117 F. 4th at 1142 (noting there is no such requirement where a subject is actively resisting arrest and poses a potential threat).  More importantly, the Court must evaluate the use of force "from the perspective of a reasonable officer on the scene," not the arrestee's subjective perception of events.  *Graham*, 490 U.S. at 396.

/ / /

At the time Post punched him, a reasonable officer would have perceived only that Plaintiff was combative, unrestrained, possibly armed, and not under the officers' control. *See* Post Decl., ¶¶ 10-12; Barfield Decl., ¶¶ 21-23; Flores Decl., ¶¶ 8-9. Post's use of a distraction blow to defend himself is exactly the sort of in-the-moment decision the Court must account for when assessing whether the use of force was reasonable. *See Est. of Strickland*, 69 F.4th at 619 (noting the "calculus of reasonableness" must "allow[] for the fact that police officers are often forced to make split-second judgements and . . . do[es] not apply the 20/20 vision of hindsight"). The Court rejects Plaintiff's further argument that Post and Weirich landed additional punches that were "not reported," as that statement is not supported by any evidence and is in fact contradicted by the bodycam footage such that "no reasonable jury could believe" Plaintiff's version of events. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see also Spencer*, 117 F.4th at 1133 (where "the uncontested video evidence from the officers' body cameras establishes the timing and occurrence of events," the Court "view[s] the facts in the light depicted by the videotape").

Considering the totality of the circumstances as stated in *Graham* and *Estate of Strickland*, and viewing the evidence in the light most favorable to Plaintiff, the Court finds that no reasonable trier of fact could conclude Post's closed-fist punch during Plaintiff's arrest on January 3, 2023 was excessive. Because the record as a whole would not lead a reasonable jury to find in Plaintiff's favor, summary judgment is warranted. *See Lowry*, 858 F.3d at 1260.

ii.    Knee Strikes

The Court likewise concludes a rational juror could not find in Plaintiff's favor with respect to the knee strikes Post and Weirich employed to get him to the

ground to be handcuffed.  Knee strikes are generally considered "an intermediate level of force."  *See Barror v. City of St. Helens*, No.: 3:20-cv-00731-AN, 2024 WL 1158336, at *6 (D. Or. Mar. 18, 2024) (noting the "general consensus" among district courts and collecting cases).  But weighed against the City's interests as measured by the severity of the crime, whether Plaintiff was actively resisting, and whether he posed a threat to the officers, the Court concludes this use of force was not excessive under *Graham* and *Estate of Strickland*.  *See Spencer*, 117 F.4th at 1138-39.

The undisputed evidence shows Plaintiff defied the officers' commands to get on the ground.  Post and Weirich told Plaintiff if he continued to resist he would be hit, but Plaintiff did not heed this warning and repeatedly attempted to stand up.  *See Lowry*, 858 F.3d at 1259 ("[A]n important consideration in evaluating the City's interest in the use of force is whether officers gave a warning before employing the force.").  When Plaintiff failed to cooperate, Post and Weirich employed knee strikes to Plaintiff's sides, delivering a total of three strikes (two on the left, one on the right).  The officers used the amount of force necessary to subdue and handcuff Plaintiff, but not more. [10]  *See Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012) ("When balancing the degree of force used against the governmental interests, it is the *need* for force which is at the heart of the analysis.")

---

[10]    Plaintiff states Post and Weirich "kicked" him in his ribs "so violently" that he learned later a rib on his left side was "broken," (*see* Opp. at 11, 13) but there is no evidence of this alleged injury in the record.  *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (affirming summary judgment where plaintiff "[did] not provide any medical records to support her claim that she suffered injury as a result of [the officer's conduct]" and therefore did not meet her burden to demonstrate she was harmed by the alleged excessive force).  Even assuming one of the knee strikes broke Plaintiff's rib, that fact would not change the Court's conclusion that this use of force was not excessive under the circumstances.

(emphasis in original); *see also Lowry*, 858 F.3d at 1258 (9th Cir. 2017) (noting "where the suspect actively resists arrest," a greater use of force may be reasonable).

Plaintiff "admit[s]" in his Opposition that "he did resist a bit," but states he was simply trying to "break free from the violence on his person." Opp. at 11. To the extent Plaintiff's argument is that he was exercising his limited right to resist, he has not offered any evidence that either Weirich or Post acted in bad faith or to provoke him. *See Arpin*, 261 F.3d at 921 ("An individual's limited right to offer reasonable resistance is only triggered by an officer's bad faith or provocative conduct."). Rather, the undisputed bodycam footage shows both officers used knee strikes to bring Plaintiff into compliance and effectuate his arrest. *See Little v. Gore*, 148 F. Supp. 3d 936, 949 (S.D. Cal. 2015) ("The right to make an arrest carries with it the right to employ some level of force to effect it.") (quoting *Bryan*, 630 F.3d at 818). Plaintiff again states he was "not in his right mind emotionally or mentally," and argues rather than "hurry . . . to place [him] in handcuffs," the officers should have seen he was a "true person in crisis." Opp. at 11-12. For the same reasons explained above, however, the Court's inquiry turns on Post's and Weirich's reasonable perceptions, not Plaintiff's state of mind. *Graham*, 490 U.S. at 396. From the point of view of the officers – and as seen on the bodycam footage – Plaintiff had already attempted to assault one of them, was actively resisting the officers' efforts to subdue him using lesser amounts of force, and ignoring their warnings they would have to use physical force if Plaintiff continued to be uncooperative. *See* Post Decl., ¶ 15; Weirich Decl., ¶ 9; Barfield Decl., ¶¶ 25-26; Flores Decl., ¶¶ 11-12.

Considering the totality of the circumstances as stated in *Graham* and *Estate of Strickland*, and viewing the evidence in the light most favorable to Plaintiff, the Court finds no reasonable trier of fact could conclude Post's and Weirich's use of knee strikes during Plaintiff's arrest on January 3, 2023 was excessive. Because the

record as a whole would not lead a reasonable jury to find in Plaintiff's favor, summary judgment is warranted.  *Lowry*, 858 F.3d at 1260.

### b. Brandt, Laser, Lundy, and Walker

Brandt, Laser, Lundy, and Walker arrived on the scene to assist Post and Weirich with Plaintiff's arrest, along with other nonparty officers.  Brandt supervised while the officers kept Plaintiff on the ground, handcuffed him, and placed him in the WRAP.  At deposition, Plaintiff was unable to identify any physical contact with Defendants that caused him harm other than by Post, Weirich, and an unknown person who "picked him up and propped him up" at the hospital.  *See* Pltf. Dep. at 295:17-25.

The undisputed evidence before the Court shows Laser, Lundy, and Walker all arrived *after* Plaintiff's struggle with Post and Weirich had ended.  Thus, even assuming there were a triable issue of fact as to whether Post's and Weirich's use of force was excessive, the other officers had no "opportunity to intercede" in that use of force and did not "participate in some meaningful way in the specific actions that constituted the violation."  *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (describing circumstances in which bystander officers can be liable for excessive force).  Laser, Lundy and Walker exerted minimal, if any, force during their interactions with Plaintiff thereafter.  Plaintiff fails to address Defendants' evidence, to identify the specific theory of any of these officers' liability for the use of excessive force, or point the Court to any evidence which would support that theory.  *See* Fed. R. Civ. P. 56(e) (Court may enter summary judgment where opposing party fails to "properly support or address" opponent's facts).

In his complaint, Plaintiff alleged his left wrist "pops," "clicks," and "hurts" due to the handcuffs being on too tight and unnamed officers "rolling [him] over on that wrist."  Dkt. No. 1 at 12.  Plaintiff appears to have abandoned this theory of liability, as he does not address it in his Opposition.  Regardless, Plaintiff has not produced any evidence of his alleged injury, and the record demonstrates

Plaintiff's handcuffs were adjusted less than two minutes after being placed, leading Plaintiff to confirm the handcuffs felt "better." *See Hupp v. City of Walnut Creek*, 389 F.Supp.2d 1229, 1233 (N.D. Cal. 2005) (denying plaintiff's motion for summary judgment in the absence of "evidence of a physical manifestation of injury or of a complaint about tight handcuffs that was ignored"); *see also Uzun v. City of Santa Monica*, 54 F.4th 595, 596 (9th Cir. 2022) (affirming summary judgment where "body camera footage shows the officers used only the force necessary to handcuff [plaintiff]" and "immediately loosened" them upon realizing the handcuffs were uncomfortably tight).

Plaintiff also states in his Opposition that "an unknown Defendant was rolling Plaintiff onto his broken rib" while he was awaiting assessment at Tri City Medical Center. Opp. at 13. It is not clear to the Court from Plaintiff's description whether the "unknown Defendant" is a law enforcement officer or a healthcare worker. The distinction is insignificant, however, because "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *Williams v. Cnty. of San Diego*, 523 F. Supp. 3d 1183, 1192 (S.D. Cal. 2021). The Court agrees with Defendants both that Plaintiff has failed to carry his burden to identify this individual and that, even crediting Plaintiff's assertions, the act of rolling Plaintiff over on his side was not an unreasonable use of force under the circumstances. *See* Defendants' Reply in Support of Summary Judgment or Partial Summary Judgment ("Reply"), Dkt. No. 77, at 6-7.

Regarding Brandt, the bodycam footage confirms he never touched Plaintiff and so did not use any force, reasonable or otherwise, against him. To the extent Plaintiff's excessive force claim against Brandt is based on his position as the officers' supervisor, that claim must fail. For the reasons stated above, the Court finds there was no constitutional violation by any of the officers at the scene. But even assuming the use of force by any other officer was excessive, Plaintiff has not adduced any evidence of Brandt's "culpable action or inaction in the training,

supervision, or control of his subordinates," "acquiescence in the constitutional deprivation," or "conduct that showed a reckless or callous indifference to the rights of others."   *See Henry A. v. Willden*, 678 F.3d 991, 1004 (9th Cir. 2012) (discussing supervisory liability in § 1983 context); *see also Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) ("[F]or a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no *respondeat superior* liability under section 1983.").

For the above reasons, the Court finds on the record before it that no rational juror could find Brandt, Laser, Lundy, or Walker liable for the use of excessive force during Plaintiff's arrest on January 3, 2023, and summary judgment in their favor is appropriate. *Matsushita Elec.*, 475 U.S. at 587; Fed. R. Civ. P. 56(a).

### c. Alarcon

In response to a request from Brandt, Alarcon arrived to photograph the scene and only entered the women's restroom after Plaintiff had been taken to Tri City Medical Center. Alarcon Decl., ¶ 6. After clearing the scene, Alarcon went to Tri City Medical Center to photograph Plaintiff. *Id.*, ¶ 10. Based on this undisputed evidence, Alarcon not only did not use any force against Plaintiff, but was not even present during his arrest. Plaintiff offers no contrary evidence from which a reasonable juror could find Alarcon liable for the use of excessive force against him. Alarcon is entitled to summary judgment in her favor. *See Matsushita Elec.*, 475 U.S. at 587; Fed. R. Civ. P. 56(a).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1          *d. City of Oceanside*[11]

2          On a liberal reading of Plaintiff's *pro se* complaint, the only cause of action

3  potentially attributable to the City is that "unknown Oceanside Police supervisors

4  and trainers . . . did not train to handle serious situation of ADA mentally disabled

5  persons."[12]   Dkt. No. 1 at 2.   The undersigned's conclusion that none of the

6  individual officers used excessive force during Plaintiff's arrest "precludes

7  municipal liability for the alleged unconstitutional use of such force." *Fairley v.*

8  *Luman*, 281 F.3d 913, 916 (9th Cir. 2002); *see also Hutt v. Pierce Cnty*., No. C09-

9  5271BHS, 2009 WL 4066839, at *5 (W.D. Wash. Nov. 20, 2009) ("if the employees

10  are not liable for constitutional violations, then municipal liability is precluded as

11  a matter of law").[13]

12          Further, even if the officers' use of force was unreasonable, the record does

13  not reflect any basis for municipal liability.  "[U]nder § 1983, local governments

14  are responsible only for their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60

15

16

17  [11]    It is unclear to the undersigned from Plaintiff's motion to amend the

18  complaint or the order granting that motion that Plaintiff named the City of Oceanside (or even "Oceanside Police Department") as a defendant. *See* Dkt. Nos.

19  6, 7.  However, for the sake of a complete record and assuming the City is a named

20  party, the undersigned concludes the City is entitled to summary judgment for the reasons set forth in this Report and Recommendation.

21

22  [12]    Although Plaintiff did not specify in his complaint or for the officers and

23  paramedics at the scene the nature of his "severe and serious mental illness" (*see* Dkt. No. 1 at 5), he testified at his deposition he suffers from paranoid

24  schizophrenia, anxiety and sleep disorder.  Pltf. Dep. at 265:10-24.

25  [13]    In certain circumstances, a constitutional deprivation may occur "as a result

26  of the collective inaction of a municipal defendant," thereby rendering the municipal defendant liable under § 1983 regardless of whether the individual

27  officers are exonerated.  *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604

28  (9th Cir. 2019).  That theory of municipal liability is not applicable here.

(2011) (emphasis in original).  "They are not vicariously liable under § 1983 for their employees' actions."  *Id.*  "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights" may justify imposing municipal liability under § 1983.  *Id.* at 61.

The standard of proof for a failure-to-train claim is "stringent," and requires a showing that "city policymakers [were] on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights," but chose not to act.  *Id.*  In essence, Plaintiff must show inaction by the City that "is the functional equivalent of a decision . . . to violate the Constitution."  *Id.* at 61-62.  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary" to prove such a claim. *Id.* at 62. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city . . . [a]nd plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989).

Plaintiff does not address his failure-to-train claim in his Opposition, and more significantly, has not adduced any evidence in support of his claim the "Department did not take into consideration on me being me[n]tally disabled or having that illness or that I identify as transgender when confronting the situation with me in the ladies [*sic*] restroom."  Dkt. No. 1 at 17.  To the contrary, Plaintiff admitted at deposition he did not tell the officers he needed an accommodation based on his purported disability, transgender status, or other condition.[14]  Pltf.

---

[14]    Plaintiff alleged in his complaint he "identif[ies] as female and transgender." *See* Dkt. No. 1 at 4, 14, 15, 17, 18.  He appears to have since retracted that allegation. *See* Pltf. Dep. at 86, 119.  Plaintiff's gender identity does not affect the Court's analysis.

Dep. at 290:10-16. The bodycam footage confirms Plaintiff's first mention of his disability status was after he was restrained, in response to questioning by the paramedics. Lundy BWC at 21:34:42-21:34:59. Because the record is devoid of any evidence upon which a rational juror could find the City deliberately failed to train its employees regarding interactions with mentally impaired persons, the City is entitled to summary judgment.

For the above reasons and based on the record before it, the Court finds no rational juror would find Defendants' use of force unreasonable under the circumstances, and **RECOMMENDS** the District Judge **GRANT** the Motion as to all Defendants on Plaintiff's Fourth Amendment excessive force claim. *See Matsushita Elec.*, 475 U.S. at 587; Fed. R. Civ. P. 56(a).

## C. Qualified Immunity

### 1. Legal Standards

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

The Court employs a two-step analysis to determine whether a government official is entitled to qualified immunity. *Tolan*, 572 U.S. at 655. First, the Court must determine whether the facts, "taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Id.* at 655-56. Second, the Court must determine "whether the right in question was 'clearly established' at the time of the violation." *Id.* at 656. "Courts have discretion to decide the order in which to engage these two prongs." *Id.*

1          ## 2. *Findings and Recommendation*

2          Given the undersigned's finding that Defendants' conduct did not violate

3     Plaintiff's Fourth Amendment rights, their entitlement to qualified immunity is

4     also established.

5          Nevertheless, in the interests of a complete record and even assuming

6     Defendants' use of force was excessive, Defendants are entitled to qualified

7     immunity.  The "salient" question for the Court is "whether the state of the law"

8     at the time of Plaintiff's arrest "provided fair warning to [D]efendants that their

9     alleged [conduct] was unconstitutional." *Tolan* at 656.  Given Plaintiff's resistance,

10    which "resulted in an extended struggle" to get him under control, the

11    undersigned is "unable to say that this is an obvious case in which . . . *every*

12    reasonable official would have understood that what [they were] doing violate[d]

13    [Plaintiff's] right to be free from excessive force."  *Spencer*, 117 F.4th at 1140.

14         The Court therefore turns to whether there is "prior case law that articulates

15    a constitutional rule specific enough to alert these officers in this case that their

16    particular conduct was unlawful."  *Hughes*, 31 F.4th at 1223.  "We do not require a

17    case directly on point, but existing precedent must have placed the statutory or

18    constitutional question beyond debate."  *Mullenix*, 577 U.S. at 12.  The Supreme

19    Court cautions the "[u]se of excessive force is an area of the law in which the result

20    depends very much on the facts of each case, and thus police officers are entitled

21    to qualified immunity unless existing precedent squarely governs the specific facts

22    at issue."  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).  Although Plaintiff "bears the

23    burden of showing that the rights allegedly violated were clearly established,"

24    because the question of whether a right is clearly established "is a pure question

25    of law," and in view of Plaintiff's *pro se* status, the Court "draw[s] on [its] full

26    knowledge of relevant precedent" and does not limit itself to cases identified by

27    the parties.  *Gordon v. Cnty. of Orange*, 6 F.4th 961, 969 (9th Cir. 2021).

28    / / /

1    Here, however, neither the parties' briefing nor the Court's research has
2    revealed any case "that articulates a constitutional rule specific enough to alert
3    *these* deputies in *this case* that *their particular conduct* was unlawful."  *Spencer*, 117
4    F.4th at 1138 (emphasis in original).  To the contrary, on similar facts, the Ninth
5    Circuit found the officer defendants were entitled to qualified immunity (at least
6    until the suspect was handcuffed), where the evidence showed the plaintiff's
7    "objective behavior involved protracted and substantial noncompliance" which
8    required the efforts of several officers to overcome.  *Id.* at 1142-43.

9    For the above reasons, the Court finds even if the officers' use of force during
10    Plaintiff's arrest on January 3, 2023 was unreasonable under the circumstances,
11    Defendants are entitled to qualified immunity.  *See Puente*, 123 F. 4th at 1060
12    ("[E]ven if we were to assume that the Defendant officers violated [the plaintiff's]
13    Fourth Amendment rights, they are nevertheless entitled to qualified immunity
14    because the relevant right asserted by [the plaintiff] was not clearly established.").
15    The undersigned therefore **RECOMMENDS** the District Judge **GRANT**
16    Defendants' motion on this alternative basis.

17    **D. *Heck* Bar**

18    In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that where
19    "a judgment in favor of the plaintiff" in a § 1983 suit "would necessarily imply the
20    invalidity of his conviction or sentence . . . the complaint must be dismissed unless
21    the plaintiff can demonstrate that the conviction or sentence has already been
22    invalidated."  *Id.* at 487.  *Heck*'s prohibition applies to convictions resulting from a
23    guilty plea.  *Martell v. Cole*, 115 F. 4th 1233, 1236 (9th Cir. 2024).  The rule set down
24    in *Heck* recognizes that "Congress has determined that a petition for writ of habeas
25    corpus, not a § 1983 action, is the appropriate remedy for state prisoners attacking
26    the . . . fact or length of their confinement." *McDonough v. Smith*, 588 U.S. 109, 118
27    n.6 (2019).
28    / / /

The parties devote considerable discussion to whether Post and Weirich had probable cause to arrest Plaintiff. Mot. at 15-16; Opp. at 5-6; Reply at 7-8. It should be noted Plaintiff did not allege in his complaint that his arrest was made without probable cause; the only Fourth Amendment violation stated was for the alleged use of excessive force. *See generally* Dkt. No. 1. Insofar as Plaintiff now asserts the arrest itself was improper, however, the Court finds that claim is barred by *Heck*. Plaintiff pled guilty to violating Penal Code § 69, resisting an executive officer in the performance of his lawful duties.[15] A finding that Post and Weirich unlawfully detained him because their arrest was not supported by probable cause would necessarily imply the invalidity of his conviction. Under *Heck*, therefore, this § 1983 action is not the appropriate vehicle to adjudicate whether or not the officers had probable cause to arrest Plaintiff on January 3, 2023. *Heck*, 512 U.S. at 487. If Plaintiff intended to raise the issue of probable cause solely to excuse his failure to cooperate with the officers, "[t]he absence of probable cause does not grant an individual the right to offer resistance [to an arrest]." *Arpin*, 261 F.3d at 921.

Defendants argue *Heck* also operates as "an absolute bar to any claim of excessive force incident to [Plaintiff's] arrest." *See* Reply at 3; *see also* Mem. at 19 (asserting "all claims for use of force, no matter how egregiously characterized, used to effectuate Plaintiff's arrest" are barred"). The Court disagrees. The Ninth Circuit has repeatedly rejected Defendants' argument, clarifying that applying the *Heck* bar in cases involving a conviction for resisting arrest requires a fact-specific inquiry into the basis for the plaintiff's plea and whether the act of resistance can

---

[15] Defendants refer to Plaintiff's "unrefuted" conviction for violation of Penal Code § 148 (resisting, delaying or obstructing an officer), *see* Reply at 2, but the record indicates Plaintiff pled guilty to violating Penal Code § 69 (resisting or obstructing an officer in the performance of their duties). *See* Ex. 13 to NOL. The distinction does not affect the Court's conclusion.

be separated from the allegedly excessive use of force. *See, e.g.*, *Martell*, 115 F. 4th at 1236-37; *Lemos v. County of Sonoma*, 40 F.4th 1002, 1008 (9th Cir. 2022) (en banc); *Sanders v. City of Pittsburg*, 14 F.4th 968, 971 (9th Cir. 2021); *Beets v. County of Los Angeles*, 669 F.3d 1038, 1042 (9th Cir. 2012); *Hooper v. Cnty. of San Diego*, 629 F.3d 1127, 1133 (9th Cir. 2011).  Nevertheless, the Court does not find it necessary to analyze whether *Heck* also bars Plaintiff's excessive-force claim under these facts, given the undersigned's findings that Defendants are entitled to qualified immunity from suit or, alternatively, to summary judgment on that claim.

### E. Other Claims Against Defendants

Plaintiff's complaint sets forth a lengthy compendium of grievances.  Having carefully reviewed the screening orders issued in this case, the undersigned finds the *only* claim on which Plaintiff was allowed to proceed was for a claim for the use of excessive force in violation of his Fourth Amendment rights.  *See* Dkt. No. 5 at 6 (finding the complaint "states a plausible cause of action *for excessive force* against Defendants that is sufficient to survive the 'low threshold' for proceeding past the *sua sponte* screening . . . ") (emphasis added).  On a liberal reading of the complaint, this would appear to encompass Plaintiff's charges of "torture," "intentional infliction of pain," "police brutality," "over excessive force," "cruel and unusual punishment," "assault and battery," and "infliction of great bodily harm."  *See* Dkt. No. 1 at 4.  For the reasons explained in this Report and Recommendation, the Court finds summary judgment in Defendants' favor is warranted on Plaintiff's claim for violation of his Fourth Amendment right to be free from the unreasonable use of force at the hands of law enforcement, however such claim was worded in the Complaint.

Moreover, Plaintiff appears to have abandoned all but his excessive force claim, as he does not address any of his other purported causes of action in his Opposition.  In the interest of a complete record and because Defendants briefed these issues, however, the Court makes the following findings.

Plaintiff's state-law claims for assault and battery fail for the same reasons his excessive force claim fails, and for the additional reason that Plaintiff has failed to produce evidence of any injury.  *See Arpin*, 261 F.3d at 922 (noting cause of action for battery against a peace officer requires plaintiff to establish the use of unreasonable force, causation, and "injury, damage, loss or harm") (collecting cases).  Any claim for "gross negligence" likewise fails for lack of evidence of causation or injury.  *See In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1141 (C.D. Cal. 2021) ("The elements of a negligence claim under California law are duty, breach, causation, and injury.") (citing *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017)).

Plaintiff's claims of "discrimination" or "deni[al] [of] fair and proper treatment" based on his alleged mental disability or sex-offender status, if they survived screening, also fail.  *See* Dkt. No. 1 at 4 (also purporting to state causes of action for "prejudice," "hate based torture towards a 290," and "deni[al] [of] proper medical treatment because a 290," and various references to wrongdoing against "ADA mentally disabled parolee").  Even assuming Plaintiff suffers from schizophrenia or another mental disorder (of which there is no affirmative evidence, although this fact appears undisputed), Plaintiff has nevertheless not produced any evidence Defendants knew or should have known of his disability, or that they arrested him "because of legal conduct related to his disability."  *See Lawman v. City & Cnty. of San Francisco*, 159 F. Supp. 3d 1130, 1147 (N.D. Cal. 2016) (enumerating elements of a cause of action for wrongful arrest under the ADA).  To the contrary, the undisputed evidence is that none of the officers knew Plaintiff nor were they aware he had a disability or required any accommodation.  Post Decl., ¶ 22; Weirich Decl., ¶ 15; Laser Decl., ¶ 15; Lundy Decl., ¶ 16.

Plaintiff has similarly failed to put forward evidence to support a claim that Defendants discriminated against Plaintiff due to his status as a sex offender.  The undisputed evidence is that Defendants were unaware that Plaintiff was a

registered sex offender until after he was restrained and they had run his name and driver's license number; none of the officers had prior dealings with Plaintiff or knew his criminal history. *See* Pltf. Dep. at 291:5-7; Post BWC at 21:27:19-21; Post Decl., ¶ 22; Weirich Decl., ¶ 15; Laser Decl., ¶ 15; Lundy Decl., ¶ 16. Plaintiff has neither identified nor proffered any evidence to the contrary. Plaintiff has also not identified any treatment he believes he should have received but did not because of his sex offender status, nor identified any evidence to support this claim. As demonstrated by the bodycam footage, he repeatedly told the officers and paramedics he did not want treatment and that he was "fine" at the time of his arrest. He was nevertheless taken to the hospital for evaluation and determined fit for booking. Laser Decl., ¶ 11.

In sum, the record is devoid of evidence from which a rational juror could find in Plaintiff's favor on any of his other various causes of action, if any of those causes of action survived the District Judge's initial screening. *See* Fed. R. Civ. P. 56(c). The undersigned therefore **RECOMMENDS** the District Judge **GRANT** the Motion and enter judgment in Defendants' favor on Plaintiff's claims for assault, battery, negligence, discrimination, prejudice, and violation of the Americans with Disabilities Act, to the extent necessary.

## F. Claims Against Known and Unknown Parties Not Served

For the reasons discussed above, the undersigned does not believe any causes of action other than Plaintiff's claim for excessive force survived screening. Again for the sake of completeness, the Court addresses Plaintiff's claims against Probation Officer T. Nelson and the parties identified only as "unknown Tri City Hospital Staff" and "unknown Oceanside Fire and Paramedics."

The docket reflects Nelson has never been served with the complaint, and the time for doing so has long since elapsed with no request by Plaintiff for additional time nor assistance with service. *See* Fed. R. Civ. P. 4(m) (providing that complaint must be served within 90 days after the complaint is filed). Despite the

opportunity to conduct discovery, Plaintiff has also not adduced any evidence of wrongful conduct that would support a jury verdict against Nelson.  For the reasons explained in this Report and Recommendation, the undersigned is skeptical that Plaintiff could do so.  The Ninth Circuit mandates, however, that a district court may not *sua sponte* dismiss a complaint for lack of service without first giving notice to the plaintiff and providing an opportunity to show good cause for the failure. *See Crowley v. Bannister*, 734 F.3d 967, 975 (9th Cir. 2013).  The undersigned therefore **RECOMMENDS** the District Judge order Plaintiff to show cause why his claims against Nelson should not be dismissed with prejudice.

The undersigned finds Plaintiff's claims against "unknown Tri City Hospital Staff" and "unknown Oceanside Fire and Paramedics," to the extent they survived screening, cannot proceed to trial.  Again, despite a full opportunity to conduct discovery, Plaintiff has neither identified these parties, nor proffered evidence of any wrongful conduct by them.  The undersigned therefore **RECOMMENDS** these claims be **DISMISSED WITH PREJUDICE**.

## IV.

## CONCLUSION

For the reasons stated above, the Court finds all Defendants are entitled to qualified immunity from suit, or, alternatively, summary judgment.  Accordingly, the undersigned Magistrate Judge **RECOMMENDS** the District Judge:

(1) adopt this Report and Recommendation in its entirety;

(2) grant Defendants' motion for summary judgment [Dkt. No. 60];

(3) enter judgment in favor of Defendants City of Oceanside, Sergeant Jeff Brandt, Officers Daniel Post, Aaron Weirich, Billy Walker, Natalie Laser, and Dustin Lundy, and Field Evidence Technician Michelle Alarcon on Plaintiff's claims arising under 28 U.S.C. § 1983;

/ / /

(4) enter judgment in Defendants' favor on all other causes of action, to the extent such causes of action survived the Court's initial screening;

(5) dismiss all claims against "unknown Tri City Hospital Staff" and "unknown Oceanside Fire and Paramedics"; and

(6) order Plaintiff to show cause why his claims against Probation Officer T. Nelson should not be dismissed.

**IT IS HEREBY ORDERED** that that any objections to this Report and Recommendation must be filed by not later than **January 31, 2025**.  The document should be captioned "Objections to Report and Recommendation."  Any response to a party's objections must be filed with the District Court and served on all parties no later than **February 10, 2025**.   A party's failure to timely file objections may waive the right to raise those objections on appeal.  *See Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

**IT IS SO ORDERED.**

Dated: January 14, 2025

Hon. David D. Leshner
United States Magistrate Judge